IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

GLENN J. WHITT,

        Plaintiff,

v.                                     Civil Action No. 1:04CV104

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    Background

    Plaintiff, Glenn J. Whitt, (Claimant), filed his Complaint on May 26, 2004 seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1] Commissioner filed her Answer on August 4, 2004.[2] Claimant filed his Motion for Summary Judgment on October 8, 2004.[3] Commissioner filed her Motion for Summary Judgment on November 4, 2004.[4] Claimant filed his Amended Motion for Summary Judgment and Memorandum in Support Thereof on July 1, 2005.[5]

B.    The Pleadings

        1.    Claimant's Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 13.

[4] Docket No 15.

[5] Docket Nos. 17, 18, and 19.

2.     <u>Commissioner's Motion for Summary Judgment</u>.

3.     <u>Claimant's Amended Motion for Summary Judgment and Memorandum in Support Thereof</u>.

C.     <u>Recommendation</u>

1.     I recommend that Claimant's Motion for Summary Judgment be DENIED and that Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ properly assessed Claimant's credibility. Also, the ALJ properly evaluated the medical opinions of record. In addition, the ALJ properly acknowledged Claimant's limitations in his RFC.

## II. Facts

A.     <u>Procedural History</u>

On October 1, 1998 Claimant filed his first application for Disability Insurance Benefits (DIB) and Social Security Income (SSI) payments. The application was denied.

On February 16, 2001 Claimant filed his second application for SSI payments alleging disability since September 1, 1998. The application was denied initially and on reconsideration. A hearing was held on May 29, 2002 and subsequently on November 21, 2002 before an ALJ. The ALJ's decision dated November 25, 2002 denied the claim finding Claimant not disabled within the meaning of the Act. The Appeals Council denied Claimant's request for review of the ALJ's decision on March 26, 2004. This action was filed and proceeded as set forth above.

B.     <u>Personal History</u>

Claimant was 33 years old on the date of the November 21, 2002 hearing before the ALJ. Claimant has the equivalent of a high school education and past relevant work experience as a gas

station attendant, a box builder/delivery driver, and a warehouse worker/delivery driver.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability September 1, 1998 - November 25, 2002:

**Heritage Hospital, Radiology Report**
**J.J. Kochkodan, M.D. 2/8/90, Tr. 208**
•        No evidence of a fracture of subluxation.

**Heritage Hospital, Emergency Report 12/22/89, Tr. 209**
•        Writing is illegible.
**Heritage Hospital, Triage Record 12/22/98, Tr. 210**
•        Motor Vehicle Accident.
•        Patient complained about back of head, neck, and lower back.
•        Patient did have some nausea.

**Heritage Hospital, Radiology Report**
**E. Mendoza, M.D. 12/23/89, Tr. 211**
•        No evidence of osseous, articular, or soft tissue abnormalities.

**Riverside Osteopathic Hospital, Medical Report**
**D.P. Vollman, D.O. 2/23/90, Tr. 215**
•        Impression: Normal CT of the cervical spine.

**Monway Family Health Center, Medical Report**
**Suzanne Hawkins, D.O. 5/16/90, Tr. 216**
•        Writing is illegible.

**Stroia Health Center, Medical Records**
**Thomas M. Pinson, D.O. 4/3/96-9/16/96 Tr. 221-225**
•        Diagnosis: Cervical/dorsal/ lumbar. Myositis/strain.

**Braxton County Memorial Hospital, Emergency Report**
**10/12/00, Tr. 226-227**
•        Writing is illegible.

**Radiology Report**
**John F. Mega, M.D./sj 10-12-00, Tr. 228**
•        Impression: Intravenous pyelogram is within normal limits.

**Braxton County Memorial Hospital, Outpatient Record**

**Arnold F. Gruspe, M.D. 11/3/00 Tr. 229-232**
- Operation: 1.) Olympus CYF flexible cystourethroscopy. 2.) Simple CMG bladder study.
- Final Diagnosis: Urine (voided): Clusters of reactive urothelial cells. Crystals present.

**Medical Record**
**Jose Bordonada, M.D. 2/6/01 Tr. 245**
- Severe right carpal tunnel syndrome requiring surgical intervention.
- Patient has failed medical management.

**West Virginia Diability Determination Service, Transcription of Tele-recorded Message**
**Arturo Sabio, M.D. 3/21/01 Tr. 252**
- Impression: Seizure disorder, by history, untreated and unconditional.
- Impression: Carpal tunnel syndrome, right wrist.
- Impression: Possible myotonic dystrophy.

**Physical Residual Functional Capacity Assessment**
**Fulvio Rogelio Franyutti, M.D. 9/15/01 Tr. 253**
- Exertional limitations: Occasionally 50 lbs., frequently 25 lbs., stand of walk 6 of 8 hours, periodically alternate sitting and standing due to discomfort, unlimited push and pull.
- Postural limitations: No climbing.
- Manipulative limitations: Limited handling. All others unlimited.
- Visual limitations: None.
- Communicative limitations: None.
- Environmental limitations: Avoid concentrated exposure to extreme cold and hazards. All others unlimited.

**Oakwood Healthcare System, Medical Records**
**P. Paruchuri, M.D. 9/9/95 Tr. 279**
- Diagnosis: 1.) Sprain of the right ankle and foot. 2.) Abrasion of the right ankle.

**Oakwood Healthcare System, Emergency Room**
**Michael Len, M.D. Tr. 286 2/12/96**
- Assessment: 1.) Acute cervical strain 2.) Acute lumbosacral strain.

**Oakwood Healthcare System, Radiology Report**
**A. J. Stone, M.D. 2/12/96 Tr. 289**
- Impression: Cervical spine and lumbosacral spine are unremarkable.

**Oakwood Healthcare System, Radiology Report**
**A. J. Stone, M.D. 2/26/96 Tr. 293**
- Impression: CT scan without contrast material is unremarkable.

**Oakwood Healthcare System, Medical Record**
**Rebecca Motley, M.D. 1/14/Year not stated Tr. 295**

- Diagnosis: Renal Lithiasis

**Oakwood Healthcare System, Medical Record**
**Hershel Moss, M.D. 1/14/Year not stated Tr. 296**
- Impression: Left Ureteral Lithiasis

**Oakwood Healthcare System, Emergency Room Record**
**Ineligible 5/15/Year not stated Tr. 297**
- Impression: Renal Lithiasis

**Oakwood Healthcare System, Radiology Report**
**A.J. Stone, M.D. 1/14/98 Tr. 299**
- Impression: Suspect a 1.0 mm opaque calculus causing obstructive uropathy on the left at the ureterovesical junction. Possibility that the calculus was passed because of considerable improvement.

**Medical Record**
**William L. Cox 9/14/95 Tr. 309**
- X-rays negative for any fracture dislocations. Patient has marked swelling of the foot and ankle suggestive of a severe strain and contusion to the dorsum of the right foot.
- No evidence of any motor or sensory deficit. Circulatory status was intact. No evidence of any compartment syndrome.

**Medical Record**
**William L. Cox, M.D. 2/15/96 Tr. 317**
- Impression: Cervical Strain. Ineligible.

**Neurology and Neurodiagnostics, Electroencephalographic Report**
**Chock Tsering, M.D. 2/16/96 Tr. 320**
- Impression: Normal EEG for the patient's age. No evidence of focal or generalized abnormality.

**Physical Therapy Evaluation**
**William L. Cox, M.D. 2/19/96 Tr. 321**
- Diagnosis: Neck and back strain.

**Neurology and Neurodiagnostics**
**Chock Tsering, M.D. 2/21/96 Tr. 324-325**
- Assessment: Normal neurological exam. Should have a CT scan done for headache. Suspect mild myofascial pain in the lumbar and para-cervical muscles. EEG scan is normal.

**Attending Physician Report**
**William L. Cox, M.D. 3/12/96 Tr. 327-328**
- Diagnosis: L-S Sprain

**United Summit Center, Assessment Report**
**Dwanetta Martin 12/5/01 329-330**
- Domain I / Self Care: no dysfunction.
- Domain II /Activities of Community Living: no dysfunction.
- Domain III / Social, Interpersonal, and Family: mild dysfunction.
- Domain IV / Concentration and Task Performance: mild dysfunction.
- Domain V / Maladaptive, Dangerous and Impulsive Behavior: Moderate Dysfunction.

**Psychological Evaluation**
**Cherie Zeigler, MA., LSW 2/1/02 Tr. 340-344**
- Axis I: Mood Disorder with mixed features due to Severe Muscle Trauma, Carpal Tunnel Syndrome, and Grand Mal Seizures.
- Axis II: No Diagnosis.
- Axis III: Epilepsy, grand mal; 354.0 carpal tunnel syndrome; history of Back injury
- Axis IV: Problems with health, occupation, and financial support.
- Axis V: GAF = 50

**Medical Report**
**Shiv Navada, M.D. 3/27/02 Tr. 345-346**
- Impression: This study is abnormal and is supportive of bilateral carpal tunnel syndrome. The changes were more prominent on the right side.

**Cardinal Psychological Services, Psychological Evaluation**
**Wilda Posey, MA. 4/4/02 and 4/5/02 Tr. 347-356**
- Axis I: 296.32 Major depressive disorder, without psychotic features, moderate.
  305 Alcohol abuse.
  305.20 Cannabis related disorder, NOS
- Axis II: 301.20 Schizoid personality disorder.
- Axis III: Reported back pain, carpal tunnel syndrome, arthritis, and seizures.
- Axis IV: Financial problems and lack of primary support.
- Axis V: Current GAF = 59

**Mental Residual Functional Capacity Test**
**Wilda Posey, MA. 4/16/02 Tr. 357-374**
- Not Significantly Limited: 12 of 20 categories.
- Moderately Limited: 5 of 20 categories.
- Markedly Limited: 3 of 20 categories.

**Shiv Navada, M.D. 4/11/02 Tr. 375**
- Impression: Bilateral carpal tunnel syndrome, history of spells, history of possible alcoholism.

**United Hospital Center, Electroencephalogram**
**Shiv Nada, M.D. 4/17/02 Tr. 376**

- Impression: Abnormal electroencephalogram due to mild intermittent slowing in a generalized distribution.

**Braxton County Memorial Hospital, Medical Records**
**Ineligible 4/26/02 Tr. 380**
- Diagnosis: B.I. carpal tunnel syndrome, severe (ineligible).

**Braxton County Memorial Hospital**
**Jose Bordonada, M.D. 5/15/02 Tr. 383**
- Diagnosis: Right Carpal Tunnel Syndrome.

**West Virginia Department of Human Services, Medical Report**
**Dr. Joe Boyce 6/18/01 Tr. 393**
- Dignosis: Carpal Tunnel Syndrome, ineligible, ineligible, generalized anxiety disorder.

**Braxton Community Health Center, Medical Report**
**Dr. Joy Boyce 6/28/1 Tr. 394**
- Patient has ongoing medical problems and is being referred to a rheumatologist/pain clinic.

**Neurologic Consultation**
**Shiv Uchila Navada, M.D. 8/29/02 Tr. 396**
- Impression: Right upper extremity pain secondary to myofascitis, arthritis and tendinitis. Status post right carpal tunnel release surgery. Stress/depression. Lateral epicondylitis. History of seizures. Heavy smoker.

**Neurologic Followup**
**Shiv Uchila Navada, M.D.  11/12/02 Tr. 403**
- Impression: Depression. Myofascitis. History of possible seizure. History of alcoholism.

**Neurologic Followup**
**Shiv Uchila Navada, M.D.  10/2/02 Tr. 404**
- Impression: Depression. Myofascitis. History of presyncope. History of possible seizure.

D.   <u>Testimonial Evidence</u>

<u>1. Claimant</u>

Testimony was taken at the May 29, 2002 hearing from Claimant, who testified as

follows (Tr. 446-47, 457-58, 461-63, 467-68):

Q      Now do you also have that problem with your left hand?

A      Yes.

Q        Could you tell me what impact it has on your ability to use your left hand?

A        It's just now getting to where it's bothering me a lot.

Q        Okay.  So this is kind of a - -

A        Pain.

Q        A newer problem?

A        Yeah.

Q        All right.  What about, well now are you right handed?

A        Yes.

Q        With your left hand are you able to hold onto objects for significant periods of time?  Gripping and grasping?

A        As of now, yes.  I can hold certain things as long as they're not too heavy.

Q        Okay.  And what problems is the left hand giving you?  What, what kind of difficulty is it giving you?

A        I have pains up my forearms.  It hurts.  My elbow.  I have a lot of pain in my elbow.

Q        As far as bending your arm at the elbow does that have any impact on the pain that you're feeling?

A        Well some mornings I can't straighten them up.  They're stuck.

Q        Now you say they.  Do you have that problem in both of them?

A        Yes.

                              *                    *                    *

Q        Tell me about that?  What's wrong with your lower back?

A       My muscles up my spine.

Q       Um-hum.

A       And if I do any real heavy lifting or anything it reinjures it, restrains it.

Q       Okay.  So you kind of have to be careful?

A       Yes.

Q       All right.  What about you, your weed eating?  Does that have any impact on your, on your low back or can you do that okay?

A       I could do that okay, but it bothers my arms a lot.

Q       Okay.  So your back is okay with that?

A       Yeah.

Q       What about lifting?  About how much can you lift and carry on a reasonably regular basis without causing yourself extra pain or strain?

A       About 20 to 25 pounds.

                              *              *              *

Q       Now on a scale from zero to ten.  Zero is no pain and ten is your worse pain. Where is your pain most of the time?

A       Most of the time around a seven.

Q       Now is that with your medicine or without your medicine?

A       It's with.

Q       How long does the medication last?

A       I don't know what you mean as far as lasting?

Q       All right.  If you get up in the morning do you take the pain medicine in the

morning?

 A  Yes.

 Q  Right when you first get up are you in more pain than you are after you take your medicine?

 A  Yes.

 Q  In other words it gives you some relief?

 A  Yes.

 Q  Does the relief last until the next dose is due?

 A  Not all the time, no.

 Q  Okay.  So that was kind of what I was getting at.  So you're saying it, the pain varies some during the day.  But you feel the seven is about where it is most of the time even with the medicine?

 A  Yeah.

 Q  Okay.  Now the sites of the pain you've told us about your hands and your arms and your low back.  Did I hear you mention your legs?

 A  Yes.

 Q  Where in your legs do you experience pain?

 A  My muscles.

 Q  Now is that the muscles in your thighs or your calves or where?

 A  Both.

 Q  Thighs and calves?

 A  Yeah.

Q       Do you expereince any muscle cramping?

A       Yes.  Spasms.

Q       Tell me about that?  Where do the spasms occur and how often?

A       They're in my arms and my legs.

Q       Is there anything that tends to trigger the spasms?

A       The more I use them.  That's when I usually have the spasms.

Q       Okay.  How, how much can you use them?  Let's say, well how do you, how can you guide yourself in activity?  What do you, how do you know when to stop or rest or anything like that?

A       Just from years of doing it.  I've been doing it for years.  My muscles have been bothering me for years.  And I just limit myself.

*                    *                    *

Q       Do you consider yourself an emotional sort of a person?

A       Yes.  I cry easy.

Q       Has that always been true?

A       No.

Q       How long has that been true?

A       Just recently.  Approximately two to three years.

Q       Is there anything you can put your finger on that causes you to cry easily or does it just happen for no apparent reason?

A       Sometimes it just happens for no reason.

Q       Do you feel sad?

A       Yeah.

Q       Okay.  How often do you find yourself getting tearful?  Approximately?

A       It's quite often.  Maybe two or three times a week.

Q       When that happens to you what do you do about it?

A       Nothing.  I just cry.  I sit in my room and do it in my room a lot.

Q       Do you try not to let other people see you?

A       Yeah.

Q       Okay.  What about being angry or irritable?  Anything like that?

A       I'm that way a lot.

Q       Have you always been that way or is that something new?

A       That's something that's pretty new.  It has a lot to do with my pain.

Q       Do you tend to say or do things as a result of being angry or irritable that maybe you wish you hadn't?

A       Yeah.  When I'm doing it I don't realize what I'm doing or what I'm saying while I'm doing it until after.

## 2. Vocational Expert

Testimony was taken at the November 21, 2002 hearing from Vocational Expert, who testified as follows (Tr. 499-502):

Q       Please, please assume a younger individual with a GED, equivalent of high school education, able to read and write.  Precluded from performing all but sedentary - - strike that - - light work, with a sit, stand option.  No hazards, such as dangerous and moving machinery, unprotected heights, no climbing.  A controlled environment with no exposure to excessive heat

12

or cold, worked as unskilled and low stress - - low stress to find as routine and repetitive tasks. Primarily working with things rather than people. One, one to two step process entry level, so the hypothetical is light, sit, stand, no hazards, climbing excessive heat or cold, unskilled, low stress. With those limitations, can you describe any work that this hypothetical individual can perform?

A        Yes, Your Honor. With those limitations, at the light level of exertion, I could offer the following. There are laundry folders, 300 local - - 48,000 nation. There are inspector checkers, 800, local - - 111,000 nation. There are sorters and graders, 200 local - - 49,000 nation. And there are hand packers, 600, local - - 200,000 nation.

Q        Do those jobs - - are those jobs consistent with the DOT?

A        They are, Your Honor, with the exception that the DOT does not mention or describe a sit, stand option. The reason I offer these, in response to your hypothetical, is based on my twenty-three years experience in placing disabled individuals in jobs. These types of jobs, typically, permit the worker to sit or stand while doing essential duties.

Q        Okay. Mr. Mahler, the jobs you named in hypothetical one, do they require repetitive hand movement?

A        Yes, they do.

Q        Do they require fine dexterity?

A        For the most part, they require gross handling, Your Honor. The folder would have more fine finger dexterity than the others.

Q        Okay. So they're. Primarily, gross grasping strength?

A        Yes, Your Honor.

Q      Except for - -

A      The folder - - the laundry folder.

Q      Okay.  Okay.  Same hypothetical, Mr. Mahler - - number two but sedentary with, primarily, gross grasping.

A      Okay.  Sedentary would be inspector checkers, 150 local - - 37,000 nation. Sorters and graders.  100 local - - 20,000 nation.  Surveillance system monitors, 50 local - - 15,000 nation.  And with just simple grasping, that would be it, Your Honor.

Q      Are those jobs also consistent with your experience?

A      Yes, they are, Your Honor, again with the exception of the sit, stand option, as described earlier.

Q      Okay.  Hypothetical three - - all right.  If the claimant's mental status affected his concentration where he could not stay on task one third to two thirds of the day, are those jobs impacted?

A      Yes, they are, Your Honor.  If this was the case, the individual could not sustain competitive employment.  You'd have to be on task, even in unskilled entry level jobs for, at least, eighty-five percent of the work day to sustain competitive employment.

Q      There is an MRFC of Ms. Posey, Dr. Stewart, in Exhibit 20F, in which they state the claimant has poor - - in twenty - - Exhibit 20F, page fourteen - - a poor ability to relate predictability in social situations.  Poor is defined as one-half to two-thirds of the time.  If that is true, are those jobs impacted in hypotheticals one and two?

A      I would say, for all practical purposes, yes, Your Honor, even though there's very little socialization.  You'd have to be around coworkers and supervisors, occasionally, during a

14

workday.

E.      Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

•       Able to hold onto objects.  (Tr. 446).

•       Able to use a hammer for fifteen minutes.  (Tr. 448).

•       Claimant is 5' 4" tall and weighs 115 pounds.  (Tr. 451).

•       Rides a lawn mover over an acre once every one or two weeks.  (Tr. 454-55).

•       Able to lift 20 to 25 pounds.  (Tr. 458).

•       Able to stand for 30 minutes.  (Tr. 458).

•       Able to walk an eighth of a mile.  (Tr. 458).

•       Able to wash dishes.  (Tr. 463).

•       Goes out to eat or watch a movie once or twice a week.  (Tr. 466-67).

•       Had an alcohol problem, including a DUI.  (Tr. 469).

•       Drinks about one or two beers a month.  (Tr. 469).

•       Smokes half a joint of marijuana twice a week.  (Tr. 470).

•       Smokes up to 4 packs of cigarettes a day.  (Tr. 483).

•       Drives about 7 miles a week.  (Tr. 485).

## II.  The Motions for Summary Judgment

A.      Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence.

Specifically, Claimant asserts that the ALJ failed to properly assess Claimant's credibility.  Also, Claimant argues that the ALJ failed to properly evaluate the medical opinions of record.  In addition, Claimant contends that the ALJ failed to properly accommodate Claimant's limitations.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ properly assessed Claimant's credibility.  Also, Commissioner asserts that the ALJ properly evaluated the medical opinions of record.  In addition, Commissioner maintains that the ALJ properly accommodated Claimant's limitations in his RFC.

B.    The Standards.

1.    Summary Judgment.    Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.    Only a final determination of the Commissioner may receive judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents

her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.    Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.    Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.    Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hayes v.  Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    Social Security - Substantial Evidence - Defined.  Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    Social Security - Sequential Analysis. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10.    Social Security - Claimant's Credibility - Pain Analysis. The determination of whether a person is disabled by pain or other symptoms is a two step process. First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

11.    Social Security - Non-treating physician. It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hayes, 907 F.2d at 1456. The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment

for that of the Commissioner.  Id.

12.  Social Security - Ultimate Issue.  Whether an individual is disabled or able to work is an issue reserved for the Commissioner.  SSR 96-5p.  Opinions as to disability or ability to work given by a treating source can "never be entitled to controlling weight or given special significance."  Id.

C.   Discussion

## 1.  Credibility

Claimant asserts that the ALJ failed to properly assess Claimant's credibility.  Commissioner counters that the ALJ properly determined Claimant's credibility.

The determination of whether a person is disabled by pain or other symptoms is a two step process.  First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged.  Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record.  Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

Claimant argues that the ALJ failed to inquire into the first step of the credibility determination.  Claimant in wrong.  In his decision the ALJ clearly inquired into the first step and found that "[t]he claimant's impairments could reasonably be expected to produce some of the symptoms and pain alleged by the claimant." (Tr. 28).  This satisfies the first prong of Craig.  The ALJ then considered Claimant's credibility of his subjective allegations of pain in light of the entire record.  The ALJ noted that the Claimant shoveled snow on January 20, 2002, mowed one acre on a weekly or bi-weekly basis, used a weed eater, worked on a car throughout the period of time he alleges total disability.  (Tr. 28-29).  The ALJ also noted that "although the claimant complains of

shortness of breath, his cigarette smoking has increased from three packs of cigarettes a day to four packs a day. He also still continues to smoke marijuana. The claimant also testified that he has had three or four seizures since the last Administrative Law Judge hearing yet the claimant reported to Dr. Nevada on November 12, 2002, that he has been seizure free for months (Exhibit 31 F, pg.1)." (Tr. 29, 470, 483). This satisfies the second prong of <u>Craig</u>. Therefore, the ALJ properly determined Claimant's credibility.

## 2. Steward/Posey Evaluation

Claimant asserts that the ALJ failed to include Claimant's poor ability to relate predictably in social situations. Commissioner counters that the ALJ properly considered the psychological evidence.

It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. <u>Hayes</u>, 907 F.2d at 1456. The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. <u>Id</u>.

"A psychological evaluation was performed by Wilda Posey, MA, on April 4, 2002 and April 5, 2002, at the request of the claimant's attorney." (Tr. 20, 347-74). Ms. Posey's opinion inconsistent with other substantial evidence in the record. The ALJ noted that "[p]sychological evaluator, Cherie Zeigler, found that the claimant's concentration and attention were good (Exhibit 18F, pg.13). Ms. Posey opined that the claimant's concentration was average (Exhibit 20F, pg. 7). Ms. Posey however stated in the mental residual functional capacity assessment (mental) that the claimant's ability to maintain attention and concentration for extended periods was moderately limited (Exhibit 20F, pg.11). However, the undersigned also notes that Ms. Posey found that the

claimant had no degree of limitation maintaining concentration, persistence, or pace when completing the psychiatric review technique form (Exhibit 20F, pg.25)." (Tr. 22, 347-374). Also, the State Agency reviewer found claimant capable of performing medium work. The ALJ modified that assessment when new evidence showed that Claimant would be capable of performing not more than light work. (Tr. 29). Therefore, the ALJ properly assessed Ms. Posey's opinion.

Claimant cites the opinions of Dr. Boyce, Cherie Zeigler, James Terry, and Dr. Nevada for the propositions that Claimant was under stress, had anger and control problems, difficulty being around other people, withdrawal, anxiety, crying, panic, phobia, manic symptoms, and appetite change. The symptoms reported by the previously noted people were based on Claimant's subjective symptoms and not on objective medical evidence. As discussed above the ALJ properly determined that Claimant was not totally credible. Therefore, the medical opinions that were based on Claimant's subjective complaints are not entitled to deference. Also, the ALJ determined that Claimant's RFC (residual functional capacity) should be limited to "perform light sit/stand work. He must perform *entry level, low stress work with one or two step routine, repetitive tasks, working primarily with things rather then people.* He must perform tasks that require primarily *gross grasping as opposed to fine manipulation*. He must also work in a controlled environment with no exposure to excessive heat or cold. The claimant should not perform tasks that require climbing, or exposure to hazards such as dangerous and moving machinery or unprotected heights." (Tr. 29). Therefore, the ALJ properly accommodated Claimant's psychological and physical limitations.

### 3. Upper Extremity Limitation

Claimant maintains that the ALJ failed to properly assess Claimant's significant upper extremity dysfunction as reported by Dr. Boyce. However, the ALJ stated "Dr. Boyce has opined

that the Claimant would be unable to perform jobs that require repetitive hand movements and manual dexterity. He also opined that the claimant would not be able to work in a high stress environment. (Exhibit 26F). The undersigned agrees with Dr. Boyce and has presented the above cited limitations to the vocational expert." (Tr. 29). The ALJ found that Claimant retained the residual functional capacity to "perform light sit/stand work. He must perform entry level, *low stress work with one or two step routine*, *repetitive tasks*, working primarily with things rather then people. He must perform tasks that require primarily *gross grasping as opposed to fine manipulation*. He must also work in a controlled environment with no exposure to excessive heat or cold. The claimant should not perform tasks that require climbing, or exposure to hazards such as dangerous and moving machinery or unprotected heights." (Tr. 29) (emphasis added). The ALJ agreed with Dr. Boyce as to Claimant's upper extremity dysfunction and accommodated Claimant's limitation in the RFC.

Dr. Boyce also opined that Claimant was totally disabled. However, whether an individual is disabled or able to work is an issue reserved for the Commissioner. SSR 96-5p. Opinions as to disability or ability to work given by a treating source can "never be entitled to controlling weight or given special significance." Id. Therefore, Dr. Boyce's opinions that Claimant was totally disabled was not entitled to deference.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and that Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ properly assessed Claimant's credibility. Also, the ALJ properly evaluated the medical opinions of record. In addition, the ALJ properly accommodated Claimant's limitations in his RFC.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to parties who appear *pro se* and any counsel of record, as applicable.

DATED: July 11, 2005

/s/ James E. Seibert

JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE